**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Fred L. LANGFORD, Defendant–
Appellant.**

**No. 89–3754.**

United States Court of Appeals,
Eleventh Circuit.

Nov. 5, 1991.

---

**22.** They could be changed, of course, on appel- late or collateral review.

John M. Fitzgibbons, Tampa, Fla., for defendant-appellant.

James Powers, Asst. U.S. Atty., Tampa, Fla., for plaintiff-appellee.

Before POWELL[*], Associate Justice, TJOFLAT, Chief Judge, and KRAVITCH, Circuit Judge.

TJOFLAT, Chief Judge:

The principal issue in this appeal, an issue of first impression in this circuit, is whether the use of multiple mailings or instrumentalities of interstate commerce in furtherance of a conspiracy to defraud a purchaser of securities can form the basis of multiple counts of an indictment under the provisions of 15 U.S.C. §§ 78j(b), 78ff, and Rule 10b–5.[1] We hold that it cannot.

## I.

From 1981 to 1983, Fred L. Langford, the appellant, was president and chief exec-

---

[*] Honorable Lewis F. Powell, Jr., Associate Justice of the United States Supreme Court, Retired, sitting by designation.

1. Stated more broadly, the issue embraces the sale as well as the purchase of securities. In this case, the alleged victim of the conspiracy to defraud was a purchaser.

utive officer of Palmetto Federal Savings and Loan Association (Palmetto Federal), a federal stock association.[2] During his tenure as president of Palmetto Federal, Langford devised and carried out a fraudulent scheme that inflated artificially the price of Palmetto Federal's stock.[3] His scheme worked in this way. The 600 Investment Corporation (600), a wholly owned subsidiary of Palmetto Federal,[4] entered into several joint venture agreements in Florida real estate on behalf of Palmetto Federal. 600 conducted sham sale transactions of its real estate interests with developers and other investors and then recorded the "profits" from these transactions on its books. The "profits" were added to Palmetto Federal's financial statements and, in turn, increased the value of Palmetto Federal's stock. Langford then arranged a sale of all of Palmetto Federal's stock to Goldome Savings Bank (Goldome) for $33.00 a share (a total of $38,000,000)— a price that significantly overrepresented its worth.[5]

In carrying out this scheme, Langford caused 600 to ignore two "generally accepted accounting principles" (GAAP):[6] Before 600 could record or "book" a profit from the sale of an interest in real estate on its financial statement, (1) it had to receive from the purchaser an adequate cash down payment[7] and, (2) it had to relinquish any continuing involvement in the assets sold. Langford, to avoid these requirements, arranged for 600 to make side payments to the developers and investors so that it would appear that the requisite cash down payment had been paid and that 600 had divested itself of a continuing interest in the assets sold; in reality, neither requirement was met.

On July 13, 1988, a federal grand jury returned the indictment in this case, charging Langford and William J. Bufe, Palmetto Federal's chief financial officer, with ten counts related to this scheme. Count one charged the defendants with conspiring to commit an offense against the United States, in violation of 18 U.S.C. § 371 (1988).[8] Counts two, three, and four charged the defendants with securities fraud relating to false statements made in a proxy statement, a telephone call, and a letter, in violation of 15 U.S.C. §§ 78j(b) and 78ff (1988).[9] Counts five and six al-

---

2. Palmetto Federal was established in 1956 as a mutual savings and loan association but converted to a federal stock association in November 1979.

3. The evidence adduced at Langford's trial established beyond a reasonable doubt the facts recited in the text. Langford's challenge to the sufficiency of the evidence to convict is meritless, as indicated in note 13 *infra.*

4. Langford was on the board of directors of both Palmetto Federal and 600.

5. 600's sham transactions for the years 1982 and 1983 artificially inflated the total selling price of Palmetto Federal stock by approximately $10,000,000.

6. Langford concedes that both Palmetto Federal, as a federal stock association, and 600, as its wholly owned subsidiary, were bound to adhere to these principles.

7. In the transactions involved in this case, GAAP required either 20% or 25% cash down payments.

8. Section 371 provides:
   If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency

thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

Count one alleged specifically that the defendants conspired to execute a scheme to defraud in connection with the sale of securities, 15 U.S.C. § 78j(b) (1988), to make false entries in the books of an insured institution, 18 U.S.C. § 1006 (1988), to make false statements to a government agency, *id.* § 1001, and to misapply funds of a federally insured institution, *id.* § 657. The remaining nine counts alleged that Langford and Bufe committed the substantive offenses outlined in the conspiracy count.

9. Section 78j provides in pertinent part:
   It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
   . . . .
   (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Com-

leged false entry offenses, in violation of 18 U.S.C. § 1006 (1988).[10] Count seven charged a false statement offense, in violation of 18 U.S.C. § 1001 (1988).[11] And counts eight, nine, and ten alleged the misapplication of the funds of an insured institution, in violation of 18 U.S.C. § 657 (1988).[12]

The case went before a jury on June 5, 1989. The Government's principal witness was Gordon Powers, executive vice president of 600. Powers testified that under Langford's orchestration, he executed several of the sham sales transactions 600 had engaged in; he located the real estate interests to be "sold," the "purchasers" of those real estate interests, and supplied side money to the "purchasers" for the required GAAP down payments.

After the Government rested its case, the court granted Langford's and Bufe's motions for judgments of acquittal on counts eight, nine, and ten of the indictment, and denied their motions on counts one through seven. The defendants then presented their cases. Langford's defense was, simply, that he played no role in the alleged scheme. Initially, he attempted to establish this point during the Government's case in chief—by cross-examining Powers. He was unsuccessful, however, so, after the Government rested its case, Langford took the witness stand. Langford testified that he had managed Palmetto Federal and 600 in a "hands off" manner; he delegated everything to his subordinates. Accordingly, although he knew about 600's real estate transactions, he knew none of the details. In short, he relied on the representations of his subordinates and the company's attorneys, who assured him that these transactions were being handled properly.

█ The jury rejected Langford's defense and found him guilty on the seven remaining counts of the indictment. Bufe, on the other hand, was acquitted. Lang-

mission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
Section 78ff provides:
(a) Any person who wilfully violates any provision of this chapter ..., or any rule or regulation thereunder ..., or any person who willfully and knowingly makes, or causes to be made, any statement in any application, report, or document required to be filed under this chapter or any rule or regulation thereunder ... which statement was false or misleading with respect to any material fact, shall upon conviction be fined not more than $1,000,000, or imprisoned not more than 10 years, or both....

10. Section 1006 provides in pertinent part:
Whoever, being an officer, agent or employee of or connected in any capacity with ... [a] savings and loan corporation or association authorized or acting under the laws of the United States ... [,] the accounts of which are insured by the Federal Savings and Loan Insurance Corporation, ... with intent to defraud any such institution or any other company, body politic or corporate, or any individual, or to deceive any officer, auditor, examiner or agent of any such institution or of department or agency of the United States, [or] makes any false entry in any book, report or statement of or to any such institution, ... shall be fined not more than $10,000 or imprisoned not more than five years, or both.
Congress amended this section in 1989 to provide the significantly harsher penalties of fines

of "not more than $1,000,000 or imprison[ment] not more than 30 years, or both."

11. Section 1001 provides:
Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

12. Section 657 provides in pertinent part:
Whoever, being an officer, agent or employee of or connected in any capacity with ... [a] savings and loan corporation or association authorized or acting under the laws of the United States ... [,] the accounts of which are insured by the Federal Savings and Loan Insurance Corporation, ... embezzles, abstracts, purloins or willfully misapplies any moneys, funds, credits, securities or other things of value belonging to such institution, or pledged or otherwise intrusted to its care, shall be fined not more than $5,000 or imprisoned not more than five years, or both....

Congress amended this section in 1989 to provide significantly harsher penalties for amounts embezzled, abstracted, purloined or misapplied that exceed $100 to include fines of "not more than $1,000,000 or imprison[ment] not more than 30 years, or both."

ford now appeals. He raises several issues, but only one—whether the securities fraud counts are multiplicitous—is worthy of discussion. We dispose of his other issues in the margin.[13]

## II.

■■■ Multiplicity is the charging of a single offense in more than one count. *United States v. Anderson,* 872 F.2d 1508, 1520 (11th Cir.1989) (quoting *Ward v. United States,* 694 F.2d 654 (11th Cir.1983)). When the government charges a defendant in multiplicitous counts, two vices may arise. First, the defendant may receive multiple sentences for the same offense. Second, a multiplicitous indictment may improperly prejudice a jury by suggesting that a defendant has committed several crimes—not one. *United States v. Reed,* 639 F.2d 896, 904 (2d Cir.1981); *United States v. Hearod,* 499 F.2d 1003, 1005 (5th Cir.1974).[14] To determine whether an indictment is multiplicitous, we first determine the allowable unit of prosecution. *See United States v. Amick,* 439 F.2d 351, 359–60 (7th Cir.1971). Thus, in the instant case, we must examine the allowable unit of prosecution under the securities provisions of 15 U.S.C. §§ 78j(b), 78ff, and Rule 10b–5, 17 C.F.R. § 240.10b–5.[15]

According to Langford, a single conspiracy to defraud under 15 U.S.C. §§ 78j(b), 78ff, and Rule 10b–5 will sustain only one conviction no matter how many times the defendant uses "a means or instrumentality of interstate commerce, or the mails" to

---

**13.** Langford's first two issues—whether the evidence was sufficient to convict and whether the district court erred in giving the jury a "conscious avoidance" instruction (addressed to Langford's purported lack of knowledge about 600's land transactions)—are meritless. The evidence was more than adequate to prove the charges beyond a reasonable doubt, *see United States v. Cole,* 755 F.2d 748, 755 (11th Cir.1985), and the challenged instruction was obviously appropriate, if not required.

Langford's third issue—whether the court improperly curtailed, in violation of the sixth amendment and Fed.R.Evid. 608(b), his cross-examination of Powers—is also meritless. Langford wanted the jury to believe that Powers, on an occasion unrelated to the transactions at issue here, had defrauded a bank by misrepresenting the value of a piece of collateral, a lease he had obtained from a tenant in a building he owned. According to Langford's attorney, the misrepresentation was admissible in evidence, under Rule 608(b), as a "bad act" probative of untruthfulness.

When counsel asked Powers about the lease, the Government objected, contending that the question called for irrelevant evidence. The court properly sustained the objection. When counsel persisted, the court invited him to pursue the matter in the absence of the jury; in the court's view, with which we agree, if counsel's line of inquiry were unsuccessful and had to be stricken, the jurors might be unable to erase the matter from their minds. Counsel declined the court's invitation and thus his right to complain to us.

Langford's fourth issue involves the prosecutor's summation before the jury; he contends that the prosecutor improperly implied that Powers had pled guilty to all counts in Langford's indictment. Prosecutorial misconduct exists were the prosecutor makes improper remarks that prejudicially affect the substantial rights of the defendant. *United States v. Walther,* 867 F.2d 1334, 1341 (11th Cir.), *cert. denied,* 493 U.S. 848, 110 S.Ct. 144, 107 L.Ed.2d 103 (1989). Here, the prosecutor's remarks were entirely proper. The prosecutor simply stated that Powers "pled guilty to *it* "—referring, given the extensive cross-examination of Powers' plea agreement, to the one charge to which Powers had pled guilty.

Finally, Langford questions the trial court's exclusion of the testimony of William Kendall, president of Goldome, that it was the opinion of Goldome's board of directors that co-defendant Bufe was "innocent" of the charges contained in the indictment. This challenge is patently frivolous.

**14.** In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

**15.** Rule 10b–5 provides:

It shall be unlawful for any person directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

further his scheme.[16] Langford contrasts the language of the securities act with that of the mail fraud statute, 18 U.S.C. § 1341 (1988),[17] and concludes that although Congress intended to punish each use of the mails under the mail fraud statute, the gist of section 78j(b) is the fraudulent scheme employed in the sale of securities—Congress required the use of the mails "solely to create a basis for federal jurisdiction."[18] Thus, the Government must charge the fraudulent scheme under section 78j(b) in a single count. The Government, on the other hand, contends that each and every use of the mails under a scheme to defraud is a separate offense.[19] We believe that Langford, as well as the Government, misreads the statute, but his claim that his indictment is multiplicitous is nonetheless meritorious.

While Langford correctly concludes that not every use of the mails, or other means of interstate commerce, in furtherance of a fraudulent scheme is indictable,[20] section 78j(b) makes it a crime to use or employ, in connection with the purchase or sale of a security, "any manipulative or deceptive device or contrivance" in contravention of the rules and regulations prescribed by the Securities and Exchange Commission (SEC). Under this authority, the SEC promulgated Rule 10b–5, which makes it unlawful for a person, in connection with such a purchase or sale, to (1) employ a device, scheme, or artifice to defraud, (2) make any false statement of material fact (or to make a material omission), or (3) engage in any act, practice, or course of business that operates as fraud or deceit upon any person. 17 C.F.R. § 240.10b–5 (1990). The allowable unit of prosecution under section 78j(b) is, therefore, the use of a manipulative device or contrivance, which, as clarified by the SEC in Rule 10b–5, does not have to be the complete scheme to defraud; rather, it can be any false statement of material fact in connection with a discrete purchase or sale of a security.

■ This accords with our interpretation of the parallel language of 15 U.S.C. § 77q(a) (1988).[21] Under section 77q(a), we

---

**16.** The three counts in question charge Langford and Bufe with the use of three different instrumentalities of interstate commerce in furtherance of their scheme. Count two charges that on July 22, 1983, Langford and Bufe sent a proxy statement to Palmetto Federal's shareholders informing them of the proposed merger with Goldome. Count three alleges that on July 17, 1983, Langford and Bufe telephoned a representative of Atlantic Financial Federal regarding a loan guarantee. Count four alleges that on July 22, 1983, Langford and Bufe sent a letter to the Alabama Federal Savings and Loan in Tuscaloosa, Alabama in which Palmetto Federal agreed to repurchase a mortgage loan from Alabama Federal. According to the indictment, all three of these communications were in furtherance of Langford and Bufe's fraudulent scheme.

**17.** Section 1341 provides in pertinent part:
Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, ... for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository ... any such matter or thing ... shall be fined not more than $1,000 or imprisoned not more than five years, or both.

**18.** *See United States v. Austin,* 462 F.2d 724, 737–38 & n. 6 (10th Cir.1972); *United States v.*

*Greenberg,* 30 F.R.D. 164, 169 (S.D.N.Y.1962); *United States v. Hughes,* 195 F.Supp. 795, 798 (S.D.N.Y.1961); *United States v. Cashin,* 281 F.2d 669, 673–74 (2d Cir.1960).

**19.** *See United States v. Mackay,* 491 F.2d 616, 619 (10th Cir.1973), *cert. denied,* 416 U.S. 972, 94 S.Ct. 1996, 40 L.Ed.2d 560 (1974).

**20.** The legislative history of the statute states that the scope of this section is confined "to *transactions* effected by the use of the mails, the instrumentalities of interstate commerce, and the facilities of a national securities exchange." S.Rep. No. 792, 73d Cong., 2d Sess. 18 (1934) (emphasis added). This indicates that the use of the mails is merely a jurisdictional requirement. *See also Austin,* 462 F.2d at 737–38 & n. 6 (10th Cir.1972).

**21.** Section 77q(a) provides:
It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—
(1) to employ any device, scheme, or artifice to defraud, or
(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in

have held that it will avail a defendant nothing that the same scheme is incorporated in each count of the indictment. *United States v. Ashdown*, 509 F.2d 793, 800 (5th Cir.1975), *cert. denied*, 423 U.S. 829, 96 S.Ct. 48, 46 L.Ed.2d 47 (1975). *See supra* note 14. It is also clear from our cases that the use of the mails (or other instrumentality of interstate commerce) in conjunction with separate purchase or sale transactions clearly is sufficient to ground multiple counts. *See Ashdown*, 509 F.2d at 800; *Sanders v. United States*, 415 F.2d 621, 626 (5th Cir.1969).[22] We have not yet considered, however, whether several mailings (or other instrumentalities of interstate commerce), all based on a single transaction, likewise may be charged in multiple counts.[23] We hold that they cannot. To avoid the vices of multiplicity in securities fraud cases, each count of the indictment must be based on a separate purchase or sale of securities and each count must specify a false statement of material fact—not a full-blown scheme to defraud—in connection with that purchase or sale.

In the instant case, Langford was charged with three counts of securities fraud, all based on the same scheme to defraud and on the same purchase of securities—the sale of Palmetto Federal's stock to Goldome. In Langford's indictment, the Government tracked the statutory language and charged generally in each count that Langford and Bufe "employ[ed] a scheme and artifice to defraud, ma[de] untrue statements of material facts and omit[ted] to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and engage[d] in acts, practices and a course of business which would and did operate as a fraud and deceit upon any person in connection with the purchase or sale of securities." The indictment did not allege, however, that each mailing (or other instrumentality of interstate commerce) contained a specific material misstatement; it did not allege that use of the mails was in conjunction with separate purchase or sale transactions. We find, therefore, that Langford's indictment was multiplicitous.

■ Langford contends that the multiplicitous counts of the indictment improperly prejudiced the jury by suggesting that the defendant committed not one but several crimes and, therefore, all three counts should be reversed. The principal danger in a multiplicitous indictment is, however, that the defendant may receive multiple sentences for a single offense. *Hearod*, 499 F.2d at 1005; *Reed*, 639 F.2d at 904 n. 6. This danger need not concern us in this

the light of the circumstances under which they were made, not misleading, or

    (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

Although this circuit has not yet determined whether the units of prosecution under 15 U.S.C. § 78j(b), Rule 10b–5, and 15 U.S.C. § 77q(a) are the same, we see no reason to interpret the sections differently in this respect—the relevant language of the sections is extremely similar—hence, congressional intent likely was the same under both statutes.

**22.** *See also United States v. Waldman*, 579 F.2d 649, 654 (1st Cir.1978) (stating that the court "agree[s] with every other circuit that has faced the question that the appropriate units of prosecution under § 77q(a) are *separate transactions* accompanied by use of the mails.") (emphasis added).

**23.** In *Ashdown,* the former Fifth Circuit stated that "it is well settled . . . that each separate use of the mails constitutes a separate offense." *Ashdown,* 509 F.2d at 800. To support this proposition the court cited *Sanders,* which made a similar statement in reference to mail fraud, not securities fraud. We assume that the court referred only to the mail fraud counts when it made this comment. In any case, since in *Ashdown* each count alleged a separate transaction, this conclusion was not necessary to the court's decision, and therefore we consider the question an open one.

In *United States v. Mackay,* 491 F.2d 616, 619 (10th Cir.1974), however, the Tenth Circuit held that the offenses of securities fraud and mail fraud were similar in that both call for proof of a scheme or design to defraud and of the use of some instrumentality of interstate commerce in furtherance of that scheme. "The jurisdictional basis is . . . the use of the mails or an instrumentality of commerce and as such each mailing is regarded as a separate crime even though it relates to essentially the same fraudulent scheme." *Id.* In support of its position, the court cited two mail fraud cases. *Id.,* at n. 1.

case as the sentences for the multiplicitous counts run concurrently.[24]

The jury properly found the evidence presented at trial to be sufficient to convict Langford on each count of the indictment. If we were to set aside Langford's three convictions for securities fraud and remand the case for retrial on one count, to be selected by the Government, as Langford asks, this body of evidence would still be available to the Government and, in our view, would lead inexorably to conviction again on the elected count. For this reason *and* because Langford's sentences on these convictions are concurrent,[25] we find the multiplicity of counts in this case to be harmless error; we therefore treat Langford's convictions, and sentences, on counts two, three, and four of the indictment as merged into one count.

### III.

For the reasons stated above, we affirm the judgment of the district court.

AFFIRMED.

---

24. *See Reed,* 639 F.2d at 904 n. 6 (stating that "[t]he principal danger in multiplicity—that the defendant will be given multiple sentences for the same offense—can be remedied at any time by merging the convictions and permitting only a single sentence."). *See also United States v. Welch,* 656 F.2d 1039, 1054 n. 21 (5th Cir. Unit A Sept.1981) (stating that no reversal is required where sentences run concurrently on multiplicitous counts). *See supra* note 14. *Cf. United States v. Lemons,* 941 F.2d 309 (5th Cir.1991) (reversing and vacating the convictions on multiplicitous counts where the sentences run consecutively).

25. In fact, all of Langford's sentences in this case—each calling for three years imprisonment—are concurrent.