IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON, )
) No. 69716-1-I
Respondent, ) (consolidated w/70010-3-I)
Cross-Appellant, )
) DIVISION ONE
v. )
)
LAURANCE D. ANTHONE, ) PUBLISHED OPINION
)
Appellant, ) FILED: October 20, 2014
Cross-Respondent. )
_____ )

BECKER, J. — In a securities fraud case, the defrauding of an individual

investor is a separate unit of prosecution even if the fraud is perpetrated through

a group presentation or through a single document signed by more than one

investor. We reverse the trial court's decision to dismiss three out of eight counts

as multiplicitous. We reject appellant's challenge to the sufficiency of the

evidence.

After working in the construction business for 17 years, Anthone left the

trade to become a developer of real estate near the end of 2002. Because he

had poor credit, Anthone was unable to obtain traditional financing. He solicited

development funds personally from individual investors. At informational

meetings held at his office in Tukwila, Anthone promised potential investors that

he had a number of real estate projects in development that would yield

substantial returns within a few months. As time went on, the projects remained undeveloped and Anthone's promises were not kept.

The State charged Anthone with numerous counts of securities fraud under RCW 21.20.010. Each count related to a different individual allegedly victimized by Anthone's fraudulent conduct. Five counts were dismissed before or during trial. Of 10 counts that went to the jury, 8 resulted in guilty verdicts. The trial court then granted Anthone's motion to dismiss counts 4, 5, and 6 as multiplicitous of count 3. Anthone was sentenced to concurrent 16 month sentences on the remaining 5 counts and was ordered to pay $208,000 in restitution. His appeal challenges the sufficiency of the evidence to support all but the conviction on count 8. The State's cross appeal challenges the dismissal of counts 4, 5, and 6.

## MULTIPLICITY

We first address the State's cross appeal. Multiplicity is the charging of a single offense in several counts. State v. Noltie, 116 Wn.2d 831, 847, 809 P.2d 190 (1991). A multiplicitous indictment may implicate double jeopardy if it results in the defendant receiving more than one sentence for the same offense. As well, it may improperly prejudice a jury by suggesting that a defendant has committed several crimes, not one. United States v. Langford, 946 F.2d 798, 802 (11th Cir. 1991), cert. denied, 503 U.S. 960 (1992).

"When the Legislature defines the scope of a criminal act (the unit of prosecution), double jeopardy protects a defendant from being convicted twice under the same statute for committing just one unit of the crime." State v. Adel,

2

136 Wn.2d 629, 634, 965 P.2d 1072 (1998). Thus, the issue here is what unit of prosecution the legislature intended as the punishable act under RCW 21.20.010. The inquiry is necessary to assure that the prosecutor has not been arbitrary in dividing ongoing criminal conduct into units in order to facilitate separate charges. Adel, 136 Wn.2d at 635. "If the Legislature has failed to denote the unit of prosecution in a criminal statute, the United States Supreme Court has declared the ambiguity should be construed in favor of lenity." Adel, 136 Wn.2d at 634-35, citing Bell v. United States, 349 U.S. 81, 84, 75 S. Ct. 620, 99 L. Ed. 905 (1955).

In this case, Anthone was charged and convicted of numerous violations of the same statute, RCW 21.20.010. The statute criminalizes securities fraud in the following terms:

> It is unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly:
>     (1) To employ any device, scheme, or artifice to defraud;
>     (2) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or
>     (3) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

RCW 21.20.010. The State elected to proceed against Anthone only under subsection (2).

The trial court ruled that counts 3 through 6 were multiplicitous, even though four different investors were involved. The four investors signed a single investment agreement at the same meeting in response to the same

3

representations about how their money would be used to develop property. The trial court concluded that Anthone committed no more than one offense with respect to these four investors. Accordingly, the court dismissed counts 4 through 6. The State contends that every time a defendant fraudulently sells or offers to sell a security to a different victim, a separate crime has occurred.

The investors were Dalbir Bhuller (count 3), Balwant Singh (count 4), Harvinder Mangat (count 5), and Sarbjit Singh (count 6). Bhuller saw a sign advertising Anthone's business, "MA Quik Framing," on a property in a neighborhood where he was interested in building a home. Bhuller went to Anthone's office and said he wanted to buy a lot. Anthone said he was in the process of developing the property into a number of lots to be known as Eden Estates. He represented Eden Estates as an investment opportunity that Bhuller could invest in if he found other investors for the project. In return for the promise of a substantial profit when the lots were sold, each investor would need to agree to pay Anthone $5,000 up front, $25,000 after approximately six weeks, and more after breaking ground. Anthone represented that everything on the property was "almost done" and he just needed "to pay all the fees and everything and start breaking the ground."

Bhuller recruited the other three investors, and together, they met with Anthone. Anthone presented them with a single "joint venture agreement." The agreement characterized the investors as joint venturers and partners in the development of Eden Estates. On June 1, 2004, Anthone and the investors signed the agreement and each investor gave Anthone $5,000.

4

The State contends the transaction supports four counts of securities fraud because each count involved a separate victim making a separate investment. Relying on Langford, Anthone responds that only one count was permissible because he sold a single security to a conglomerate of buyers.

The defendant in Langford employed a scheme to inflate the price of a private company artificially before its purchase by a single buyer. The government charged three counts of securities fraud related to separate false statements made in a proxy statement, a telephone call, and a letter. Langford, 946 F.2d at 800. The court concluded that the convictions on those counts were multiplicitous because all three were "based on the same scheme to defraud and on the same purchase of securities." Langford, 946 F.2d at 804.

Unlike in Langford, here the four counts at issue involved sales to different investors. The fact that all four signed the same agreement does not justify Anthone's description of them as a "conglomerate" that engaged in a single purchase. It was Anthone who insisted that Bhuller recruit additional investors, and it was Anthone who prepared the agreement that defined them as joint venturers. The agreement was itself an instrument of the fraud. It does not obscure the reality that Anthone directly or indirectly induced each investor into contributing personal funds.

The term "sale" is defined broadly by statute:

"Sale" or "sell" includes every contract of sale of, contract to sell, or disposition of, a security or interest in a security for value. "Offer" or "offer to sell" includes every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security for value.

5

RCW 21.20.005(14).

The term "security" is also defined broadly. As relevant here, and as reflected in a jury instruction, the definition includes any "certificate of interest or participation in any profit-sharing agreement," as well as any "investment of money or other consideration in the risk capital of a venture with the expectation of some valuable benefit to the investor where the investor does not receive the right to exercise practical and actual control over the managerial decision of the venture." RCW 21.20.005(17)(a); see Instruction 19. Notably, the definition applies "whether or not the security is evidenced by a written document." Former RCW 21.20.005(12)(a) (2006), recodified as RCW 21.20.005(17)(a).

The Securities Act of Washington, chapter 21.20 RCW, is interpreted broadly to protect investors, and its antifraud goals "should not be frustrated merely because a scheme uses novel or atypical transactions." Kinney v. Cook, 159 Wn.2d 837, 846, 154 P.3d 206 (2007). Looking to the broad definitions of "sale" and "security," we conclude the statute unambiguously makes each sale or offer to sell a security a separate unit of prosecution. See United States v. Dioguardi, 492 F.2d 70, 83 (2d Cir.) ("Each transaction in a securities fraud case constitutes a separate offense."), cert. denied, 419 U.S. 873 (1974). We further conclude the State employed an appropriate unit of prosecution in counts 3 through 6 because each was based on a separate sale. Each investor made a separate investment in the supposed "joint venture." The money Anthone received came from individuals, not from a single organized entity. The trial

6

court's determination that counts 4 through 6 are multiplicitous of count 3 must accordingly be reversed.

## SUFFICIENCY OF THE EVIDENCE

Anthone's appeal argues that with the exception of count 8, the evidence was insufficient to prove that he committed securities fraud. Because this is a sufficiency challenge, we draw all reasonable inferences from the evidence in favor of the State. State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).

The three subsections of RCW 21.20.010 state several ways in which securities fraud can be committed. The to-convict instructions show that the State elected to proceed at trial only under the second subsection. For example, the to-convict instruction in count 3, involving Bhuller, required proof beyond a reasonable doubt of the following elements:

> (1) That during a period of time intervening between May 1, 2004 and August 5, 2005, the defendant, directly or indirectly, willfully made an untrue statement of material fact to Dalbir Bhuller, or omitted to state a material fact to Dalbir Bhuller that was necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and
> (2) That the acts described in (1) were in connection with the sale of a security to Dalbir Bhuller; and
> (3) That the acts occurred in the State of Washington.

Instruction 9; see RCW 21.20.010 (2).

For the conviction on count 8, involving investor Kanwaljit Dulai, Anthone concedes there was sufficient evidence that he made untrue statements of material fact. The joint venture agreement that Dulai signed represented Anthone as the property owner of the land that the venture would develop into town homes. Anthone admits he was not the owner. He also concedes there

was evidence that he represented that he and Dulai were the only people with a financial stake in the property, when in fact he had sold another investor a financial stake in the same development.

For the remaining counts, Anthone argues there is no evidence that he made any untrue statements or omissions of a material fact. He points out instances where a particular witness could not remember hearing him make any particular statements that were untrue. Some witnesses could testify to receiving only a general impression about what was being promised. But taking the record as a whole and all inferences in favor of the State, we conclude that for each investor there was sufficient evidence that Anthone made material misrepresentations of fact, directly or indirectly.

The State presented evidence that Anthone made statements to the effect that his real estate projects were "ready to go" and he was about to "break ground." The evidence showed, however, that at the time Anthone made these statements, Anthone had done next to nothing to prepare the land for development. Trishah Bull, a planner for King County Department of Development and Environmental Services, testified that Anthone did not file an application to develop Eden Estates until September 9, 2004. This was three months after he promised it was ready to go and accepted investments for the purpose of completing it. Bull testified that the application had to be cancelled in January 2006 because, despite meetings with Anthone that were held to make him aware of deficiencies in the application, he did not correct errors or supply requested information.

8

Anthone told Bhuller, Balwant Singh, Mangat, and Sarbjit Singh that authorization to develop Eden Estates would be obtained shortly after he received their payments, when in fact he had barely begun the lengthy permitting process. Bhuller testified that Anthone represented that the investors' money would be used only to pay for municipal fees, excavate the property, and put in a sewer. In fact, according to a chart prepared by one of Anthone's employees, his business plan was to use all but 15 percent of the invested cash to pay salaries, overhead, and profit. This employee also testified that Anthone was unable to obtain permits and never completed any of his development projects.

Anthone represented that projects would soon come to fruition, but he did not disclose the existence of wetlands that he knew would be a substantial obstacle to development. Anthone held himself out to investors as a contractor as well as a developer, when in fact his contractors' license had been revoked before he began soliciting investments. He held himself out as an experienced developer and failed to disclose that he had never completed a project. He made agreements to provide promissory notes and deeds of trust when he knew he was not in a position to give any security. Among other things, Anthone did not disclose that land he promised to provide as security was heavily encumbered by senior lenders or not owned by him at all.

In short, the evidence was sufficient to support the jury in finding, for each count on which there was a guilty verdict, that Anthone misrepresented or omitted material facts relating to the sale of a security.

## STATUTE OF LIMITATIONS

Anthone contends that the convictions on counts 2, 11, and 15 must be reversed because the State did not prove the offenses occurred within the five-year limitation period imposed by RCW 21.20.400(3).

The to-convict instructions for counts 2, 11, and 15 added a temporal element related to the statute of limitations for securities fraud. For example, count 2 involved investor Philip Ross. The charging period for the count began on July 11, 2003, the date that Ross invested with Anthone. A statute of limitations issue existed because the charge on count 2 was not filed until August 5, 2008. To ensure that Anthone was not convicted based on conduct outside the five-year limitations period, the jury was instructed to convict only if at least one materially misleading statement or omission "in connection with" the sale of a security to Phillip Ross occurred after August 4, 2003.[1] The phrase "in

---

[1] To convict LAURANCE D. ANTHONE of the crime of Securities Fraud as charged in Count 2, each of the following elements of the crime must be proven beyond a reasonable doubt:
   (1) That during a period of time intervening between July 11, 2003 and August 5, 2005, the defendant, directly or indirectly, willfully made an untrue statement of material fact to Phillip Ross, or omitted to state a material fact to Phillip Ross that was necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and
   (2) That the acts described in (1) were in connection with the sale of a security to Phillip Ross; and
   (3) That the acts occurred in the State of Washington; and
   (4) That at least one act described in (1) in connection with the sale of a security to Phillip Ross occurred after August 4, 2003.
   If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty on Count 2.
   On the other hand, if, after weighing all the evidence, you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty as to Count 2.

connection with" was defined to mean "acts or omissions occurring at or around the time of the offer or sale and acts occurring subsequent to the offer or sale that 'lull' the investor into a false sense of security and that are designed to prevent detection of a defendant's fraud." Another instruction informed the jury that lulling "occurs when the defendant's activities induce the investor into a state of passive inactivity. Lulling ceases when a reasonable person knows or should have known of the defendant's fraudulent activities."

Anthone does not assign error to the instructions, which were based on case law providing that where the prosecution is for a Ponzi-type scheme, a defendant's lulling activities that serve to perpetuate the fraud will toll the securities fraud statute of limitations. State v. Argo, 81 Wn. App. 552, 567-68, 915 P.2d 1103 (1996). Under the lulling doctrine, transactions that occur more than five years before the filing of the information will not be time barred when the defendant's activities have lulled victims into a "state of passive inactivity." Argo, 81 Wn. App. at 567. In a scheme like the one discussed in Argo, the statute of limitations does not begin to run until the fraudulent activities cease. Argo, 81 Wn. App. at 568.

Under the instructions received by the jury, count 2 was timely if the State proved that between July 11, 2003, and August 5, 2003, there was at least one act or omission by Ross that lulled Ross into a state of inactivity. The State met its burden with evidence that when Ross made his investment, Anthone promised a return of $60,000 by October 17, 2003. A jury could find that this

promise lulled Ross into a false sense of security and prevented him from detecting that fraud had occurred until at least October 17, 2003.

Count 11 involved Paulina Chhour, who invested $13,500 with Anthone on July 22, 2003. Chhour testified that she did not have any contact with Anthone after signing the agreement on July 22, 2003. The information charging this count was filed on October 14, 2008, more than five years later. The State thus had to prove that Anthone lulled Chhour into inactivity between July 22 and October 15, 2003. The State met its burden with evidence that Anthone promised Ross she would receive a substantial return on her investment in three months. He thereby prevented detection of the fraud for at least three months.

Count 15 involved Frederick Wilson, who made an investment on August 1, 2003. Anthone promised Wilson he would have a return on his investment on December 2, 2003. The State filed the charge on January 5, 2009, more than five years after the return date. However, there was evidence that after the return date, Anthone told Wilson that minor issues in the development process prevented payment and the project was going to take longer to complete than originally anticipated. Wilson testified that Anthone extended the completion date many times, advising patience. Wilson could not testify with precision when these "lulling" communications occurred. His best estimate was one to three months after December 2, 2003. Wilson's close friend and coinvestor, Dennis Rossignol, testified that for at least "one to three months after" the December 2, 2003, return date, Anthone continued to promise that the investment would be reassigned to another project. A jury could find that at least one act or omission

that amounted to lulling occurred within five years before the information was filed.

The convictions on counts 2, 3, 11, and 15 are affirmed. The order dismissing counts 4, 5, and 6 as multiplicitous of count 3 is reversed, and the evidence supporting counts 4, 5, and 6 is held sufficient. The case is remanded for further proceedings consistent with this opinion.

Becker, J.

WE CONCUR: